The **UNITED STATES** of America, Plaintiff,

v.

**BISHOP PROCESSING COMPANY**, a body corporate of the State of Maryland, Defendant.

Civ. No. 19274.

United States District Court
D. Maryland.

July 16, 1968.

Stephen H. Sachs, U. S. Atty., and Theodore R. McKeldin, Jr., Asst. U. S. Atty., Baltimore, Md., and Walter Kiechel, Jr., Atty., Dept. of Justice, Washington, D. C., for plaintiff.

Porter, Cullen & Clark and W. Edgar Porter, Salisbury, Md., and Pledger & Mahoney and James C. Eastman, Washington, D. C., for defendant.

THOMSEN, Chief Judge.

This action has been brought by the United States under the Clean Air Act (the Act), 42 U.S.C. § 1857 et seq., particularly section 108(g) (1) of the Act, as amended November 21, 1967, 81 Stat. 496, 507, now codified as 42 U.S.C. § 1857d(g) (1).[1] The government seeks to enjoin Bishop Processing Company (the defendant), the operator of a rendering and animal reduction plant near Bishop, Worcester County, Maryland, from discharging malodorous air pollutants, which it is alleged, move across the state line and pollute the air in and around Selbyville, Delaware. Defendant has filed a motion to dismiss the complaint on four grounds, namely: (I) that

the Act is an unconstitutional attempt by Congress to control purely local intrastate activities over which Congress has no power to legislate; (II) that the complaint fails to state a cause of action under the Act; (III) that the requisite administrative steps have not been adequately defined or properly concluded as required by law; and (IV) that remedial action concerning defendant's alleged pollution was and is currently pending in a state court in Maryland, and that this Court cannot take jurisdiction under the Act while such an action is pending.

In 1967 defendant filed a "petition" in this Court against the Secretary of Health, Education and Welfare (the Secretary), seeking declaratory relief and judicial review under the Administrative Procedure Act (APA)[2] of certain rulings made by a hearing board at a public hearing held under the provisions of the Clean Air Act. Defendant herein raised in that case many of the questions which it has raised in its pending motion. The Court dismissed that petition, holding that the questions could be raised by defendant in an action under section 1857d (g), if and when filed. Bishop Processing Co. v. Gardner, 275 F.Supp. 780 (D. Md.1967).

The November 1967 amendments to the Act will be discussed below. They provide certain alternative procedures to those provided in the Act as originally drawn, but retain most of the earlier provisions and do not purport to halt proceedings already begun thereunder, nor to prohibit the institution of new proceedings under the earlier provisions, as amended.

### The Statute and the Administrative Proceeding

The administrative proceeding which led to this suit was initiated by a request from the Delaware State Air Pollution

---

1. Unless otherwise indicated, section references will be to sections of Title 42, U.S. Code, as they appear in the February 1968 Supplement to U.S.C.A. Many of the sections were renumbered as a result of the 1967 Amendments; e.g., section 1857d (g) (1) in its earlier form was codified in 42 U.S.C.A. and its 1967 Cumulative Annual Pocket Part as section 1857d (f) (1).

2. 5 U.S.C.A. 551–559.

Authority under section 1857d(d) (1) (A).[3] In response to that request the Secretary called a conference, which was held in Selbyville, Delaware, on November 9 and 10, 1965. The statute[4] specified the parties who should be invited to participate in such a conference, namely, representatives of the air pollution control agencies of the states and municipalities concerned, and provided that the agencies called to attend such conference might bring such persons as they desired to the conference. Bishop was not invited to the conference and did not request an opportunity to participate.

Pursuant to section 1857d(e)[5] the Secretary forwarded to the participants a summary of the conference discussions and recommendations for remedial action. Those recommendations called upon the Maryland authorities to require Bishop to complete certain remedial action on or before September 1, 1966. The recommended remedial action was not taken.

Under section 1857d(f) (1)[6] the Secretary is authorized to call a public hearing if "at the conclusion of the period so allowed, such remedial action or other action which in the judgment of the Secretary is reasonably calculated to secure abatement of such pollution has not been taken".

Appropriate findings to that effect were included in a Notice of Public Hearing Concerning Interstate Air Pollution in the Selbyville, Delaware-Bishop, Maryland area, which the Secretary issued on April 21, 1967. Copies of the Notice of Public Hearing and of the "Hearing Procedures" for that hearing were sent to Bishop, and to the Maryland State Department of Health, the Delaware State Air Pollution Authority, the Worcester County (Maryland) Department of Health and the Town of Selbyville. The composition of the Board and the hearing procedures were in accordance with Part 81 of Title 42, C.F.R., set out in the Notice of Proposed Rule Making, dated March 28, 1967, published in the Federal Register on April 3, 1967.

The Hearing Board met on May 17 and May 18, 1967, heard testimony and received other evidence. Bishop was represented by counsel, who made and raised 38 objections to evidence and other points, challenging inter alia the authority and composition of the Hearing Board.

The Hearing Board made findings and recommendations and forwarded them to the Secretary, as required by section 1857d(f) (2).[7] Such a Board is not authorized to issue any order, but its recommendations are not subject to review or modification by the Secretary, who is required by law to forward the findings and recommendations of the Board to the polluter, together with a notice specifying a reasonable time (not less than six months) to secure abatement of the pollution. See section 1857d(f) (3).[8] Accordingly, on May 25, 1967, the Secretary sent the following notice to Bishop:

"THE SECRETARY OF HEALTH, EDUCATION, AND WELFARE WASHINGTON

In the Matter of

INTERSTATE AIR POLLUTION IN SELBYVILLE, DELAWARE-BISHOP, MARYLAND, AREA

NOTICE

"There are attached hereto, and made a part hereof, the Findings, Conclusions, and Recommendations, dated May 19, 1967, of the Hearing Board convened pursuant to the pro-

---

3. Formerly section 1857d (c) (1) (A), which was not amended but was renumbered in 1967.

4. Old section 1857d (c) (2), which was amended in 1967 to provide, as new section 1857d (d) (2), that the Secretary shall make available to interested parties a federal report with respect to the mat-

ters before the conference, and shall give interested parties an opportunity to present their views to the conference.

5. Formerly section 1857d (d).

6. Formerly section 1857d (e) (1).

7. Formerly section 1857d (e) (2).

8. Formerly section 1857d (e) (3).

visions of section 105(e) (1) of the Clean Air Act [42 U.S.C. 1857d(e) (1)] which held a public hearing in the matter of the interstate air pollution in the Selbyville, Delaware-Bishop, Maryland area.

"In accordance with section 105(e) (3) of the Clean Air Act [42 U.S.C. 1857d(e) (3)] the Bishop Processing Company, Bishop, Maryland is hereby notified and directed to cease and desist from discharging malodorous air pollutants and to abate such air pollution not later than December 1, 1967, by the installation, completion and placing into operation adequate and effective control systems and devices, as recommended by the Hearing Board.

"Dated: May 25, 1967.

(S) John W. Gardner
Secretary"

The Secretary is not authorized to impose any sanctions for failure to comply with such a "notice" and what is "directed" therein. What the Secretary may do is set out in section 1857d(g) (1),[9] which provides in pertinent part:

"If action reasonably calculated to secure abatement of the pollution within the time specified in the notice following the public hearing is not taken, the Secretary—

"(1) in the case of pollution of air which is endangering the health or welfare of persons (A) in a State other than that in which the discharge or discharges (causing or contributing to such pollution) originate, * * * may request the Attorney General to bring a suit on behalf of the United States in the appropriate United States district court to secure abatement of the pollution."

Section 1857d(h) [10] provides:

"The court shall receive in evidence in any suit brought in a United States court under subsection (g) of this section a transcript of the proceedings before the board and a copy of the board's recommendations and shall receive such further evidence as the court in its discretion deems proper. The court, giving due consideration to the practicability of complying with such standards as may be applicable and to the physical and economic feasibility of securing abatement of any pollution proved, shall have jurisdiction to enter such judgment, and orders enforcing such judgment, as the public interest and the equities of the case may require."

### Discussion of Defendant's Points

#### I.

The first ground stated in defendant's motion to dismiss is that the Clean Air Act is an unconstitutional attempt by Congress to control purely local intrastate activities over which Congress has no power to legislate. Defendant argues (a) that the movement of pollutants across state lines is not interstate commerce itself, and (b) has no substantial effect on interstate commerce.

(a) The movement of pollutants across a state line is a proper jurisdictional basis for the provisions of the Act relating to the abatement of interstate air pollution. Such movement of pollutants across state lines constitutes interstate commerce subject to the power granted to Congress by the Constitution to regulate such commerce.

Whether the originator of the pollution directs it across state borders intentionally is immaterial. In Thornton v. United States, 271 U.S. 414, 46 S.Ct. 585, 70 L.Ed. 1013 (1926), the owner of cattle which ranged on land near the Florida-Georgia border claimed that they were not within interstate commerce and, consequently, that he could not be required to comply with a federal requirement for the inspection and preventive treatment of cattle in an area under quarantine. The Supreme Court upheld the constitutionality of the applicable statute, stating:

"* * * [I]t is said that these cattle do not appear to have been in-

---

9. Formerly section 1857d(f) (1).

10. Formerly section 1857d(g).

tended to be transported by rail or boat from one state to another and this only is interstate commerce in cattle under the Constitution. They were on the line between the two states. To drive them across the line would be interstate commerce, and the act of 1905 expressly prohibits driving them on foot when carrying contagion. It is argued, however, that when the cattle only range across the line between the states and are not transported or driven, their passage is not interstate commerce. We do not think that such passage by ranging can be differentiated from interstate commerce. It is intercourse between states, made possible by the failure of owners to restrict their ranging and is due, therefore, to the will of their owners." 271 U.S. at 425, 46 S.Ct. at 588.

In United States v. Darby, 312 U.S. 100, 114, 61 S.Ct. 451, 457, 85 L.Ed. 609 (1941), the Court quoted from Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 196, 6 L.Ed. 23 (1824) as follows:

"The power of Congress over interstate commerce 'is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution.' * * * It is no objection to the assertion of the power to regulate interstate commerce that its exercise is attended by the same incidents which attend the exercise of the police power of the states."

■ The commerce power may be exercised to achieve socially desirable objectives, even in the absence of economic

considerations. Brooks v. United States, 267 U.S. 432, 436, 45 S.Ct. 345, 69 L.Ed. 699 (1959).[11]

(b) Defendant contends that pollution has no substantial and harmful effect on commerce, arguing that the congressional finding that air pollution has resulted in hazards to air and ground transportation is clearly erroneous, and that if pollution has any effect on air and ground transportation, such effect has been isolated and insubstantial.

■ Since the provisions of the Act relating to the abatement of interstate air pollution may properly be based on the interstate movement of the pollutants themselves, it is not necessary that such pollutants interfere with interstate commerce in order to sustain this exercise of the commerce power. Congress, however, concluded that

"the growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles, has resulted in mounting dangers to the public health and welfare, including injury to agricultural crops and livestock, damage to and the deterioration of property, and hazards to air and ground transportation." Section 1857(a) (2).

The finding in section 1857(a) (2), quoted above, is adequately supported by the legislative history.[12]

■ A court's review of such a congressional finding is limited. The only questions are whether Congress had a rational basis for finding that air pollu-

---

11. The Supreme Court has upheld the application of the commerce power to the interstate transportation of lottery tickets, Champion v. Ames, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903); stolen cars, Brooks v. United States, supra; kidnapped persons, Gooch v. United States, 297 U.S. 124, 56 S.Ct. 395, 80 L.Ed. 522 (1936); to prostitution, Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917); Hoke v. United States, 227 U.S. 308, 33 S.Ct. 281, 57 L. Ed. 523 (1913); and to racial discrimination, Heart of Atlanta Motel, Inc. v. Unit-

ed States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964).

12. This conclusion was supported by the legislative history. "Strong evidence that air pollution is associated with a number of respiratory ailments" was noted in one report (Staff Report to the Senate Comm. on Public Works, A Study of Pollution—Air, printed as Appendix I to Hearings on Bill Pertaining to the Prevention and Abatement of Air Pollution, Before a Special Subcommittee on Air and Water Pollution of the Senate Committee on

tion affects commerce, and if it had such a basis, whether the means selected to eliminate the evil are reasonable and appropriate. Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 248, 259, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Katzenbach v. McClung, 379 U.S. 294, 303, 304, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968).

■ Defendant argues that the congressional finding that air pollution has an effect on air and ground transportation is "clearly erroneous", since the legislative history provides only "isolated and insubstantial" interferences with transportation. The power of Congress to regulate activities affecting interstate commerce is to be determined not only by the quantitative effect of individual operations, but also by the total effect of many individual interferences with commerce, United States v. Darby, supra, 312 U.S. at 123, 61 S.Ct. 451, and their recurring nature, Chicago Bd. of Trade v. Olsen, 262 U.S. 1, 40, 43 S.Ct. 470, 67 L.Ed. 839 (1923).

Defendant next argues that non-visible pollution has no effect upon commerce and consequently Congress has no authority over "odorous pollution".

The complaint recites the following findings of fact made by the Hearing Board:

"3. The malodorous pollution consists of sickening, nauseating and highly offensive odors which are pervasive in effect to the interstate Selbyville, Delaware-Bishop, Maryland area. Such noxious, malodorous air pollution endangers the health and welfare of persons in the town of Selbyville, Delaware and adjacent and contiguous areas. It causes nausea, sleeplessness, and revulsion, thereby imposing a physiological and psychological burden on persons subjected thereto; and it

adversely affects business conditions and property values and impedes industrial development." (Complaint, paragraph II, p. 6)

Paragraph VII of the complaint alleges, inter alia, that "said air pollution is now continuing unabated".

■ Whether or not the findings of fact made by the Hearing Board will be treated as evidence of the facts so found when this case comes on for trial, the complaint alleges them as facts, and they must be considered to have been admitted by defendant for the purposes of its motion to dismiss.

■ Malodorous pollution which "adversely affects business conditions and property values and impedes industrial development" would clearly interfere with interstate commerce.

■ Defendant's argument that there is no economic relationship between the activity regulated and the commerce protected must also fail. As we have seen, Congress undertook to regulate the movement of pollutants across state borders, and it is alleged that those pollutants do interfere with interstate commerce. Hence, the "local activity" (the operation of the rendering plant) is subject to the power of Congress to regulate interstate commerce. In Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964), the Court said:

"It is said that the operation of the motel here is of a purely local character. But, assuming this to be true, '[i]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze'. United States v. Women's Sportswear Mfg. Association, 336 U.S. 460, 464, 69 S.Ct. 714, 93 L.Ed. 805 (1949)."

The Court added:

" 'The power of Congress over interstate commerce is not confined to the

---

Public Works, 88th Cong., 1st Sess., at 417 (1963)). Evidence that air pollution damages agriculture and property to the extent of 11 billion dollars annually was

also presented (Statement of V. G. MacKenzie, Chief, Division of Air Pollution, Public Health Service (Hearings, Id., at pp. 67, 83)).

regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce. See McCulloch v. Maryland, 4 Wheat. 316, 421, 4 L.Ed. 579.' 312 U.S. at 118, 61 S.Ct. at 459.

"Thus the power of Congress to promote interstate Commerce also includes the power to regulate the local incidents thereof, including local activities in both the States of origin and destination, which might have a substantial and harmful effect upon that commerce." 379 U.S. at 258, 85 S.Ct. at 358.

■ Congress had a rational basis for finding that air pollution affects commerce, and the means selected by Congress to eliminate the harmful effects of the interstate movement of air pollutants are reasonable and appropriate.

## II.

Defendant argues that "offensive odors" do not constitute "air pollution" under the Act. It admits that "odor" is defined as "the property of a substance which affects the sense of smell". We are dealing in this case with the movement from Maryland to Delaware of physical molecules of matter whose presence is recognized in Selbyville by their odor.

■ The meaning of the word "pollute" is "to make foul, or unclean" (Random House Dictionary of the English language, 1966 ed.). No definition of "air pollution" is contained in the Clean Air Act of 1963 or in the 1967 amendments. Congress must have intended the term to be taken in its dictionary meaning.

Defendant's citations to legislative history are examples of pollutants which do not pretend to be exhaustive or limiting. Moreover, many of the specific pollutants cited have an obnoxious odor, and a principal objection to such pollutants is their objectionable odor.

## III.

To support its contention that the requisite administrative steps have not been adequately defined nor properly concluded as required by law, defendant argues several points, which will be considered below. Preliminarily, however, the nature of the administrative proceedings and of the present suit should be reviewed. The history of those proceedings has been outlined above.

■ The *conference*, which was held in 1965, was a conference between representatives of public agencies to consider the problem. Due process did not require that the alleged polluter be invited to that conference, which was neither a rule-making nor an adjudicative hearing. The 1967 amendments do require that in the future, thirty days notice of such a conference be given by publication, and that "interested parties" be given an opportunity to present their views. Section 1857d(d) (2). The Report of the House Committee [13] indicates that the purpose of this amendment was to provide the conferees with the broadest review of the pollution problems in a given area. The amendment was not required by due process or by any provisions of the APA.

The *hearing* in May 1967, some eighteen months after the conference, was held in strict accordance with the provisions of the Act. Section 1857d(f) provides, with minor amendments made in November 1967:

"(1) If, at the conclusion of the period so allowed, such remedial action or other action which in the judgment of the Secretary is reasonably calculated to secure abatement of such pollution has not been taken, the Secretary shall call a public hearing, to be

13. H.R.Rep.No. 728, 90th Cong., First Session (1967), p. 27; U.S.Code Congressional and Administrative News, p. 1938.

held in or near one or more of the places where the discharge or discharges causing or contributing to such pollution originated, before a hearing board of five or more persons appointed by the Secretary. Each State in which any discharge causing or contributing to such pollution originates and each State claiming to be adversely affected by such pollution shall be given an opportunity to select one member of such hearing board and each Federal department, agency, or instrumentality having a substantial interest in the subject matter as determined by the Secretary shall be given an opportunity to select one member of such hearing board, and one member shall be a representative of the appropriate interstate air pollution agency if one exists, and not less than a majority of such hearing board shall be persons other than officers or employees of the Department of Health, Education, and Welfare. At least three weeks' prior notice of such hearing shall be given to the State, interstate, and municipal air pollution control agencies called to attend such hearing and to the alleged polluter or polluters. All interested parties shall be given a reasonable opportunity to present evidence to such hearing board.

"(2) On the basis of evidence presented at such hearing, the hearing board shall make findings as to whether pollution referred to in subsection (a) of this section is occurring and whether effective progress toward abatement thereof is being made. If the hearing board finds such pollution is occurring and effective progress toward abatement thereof is not being made it shall make recommendations to the Secretary concerning the measures, if any, which it finds to be reasonable and suitable to secure abatement of such pollution.

"(3) The Secretary shall send such findings and recommendations to the person or persons discharging any matter causing or contributing to such pollution; to air pollution control agencies of the State or States and of the municipality or municipalities where such discharge or discharges originate; and to any interstate air pollution control agency whose jurisdictional area includes any such municipality, together with a notice specifying a reasonable time (not less than six months) to secure abatement of such pollution."

The Secretary was not authorized before the 1967 amendments and is not now authorized to impose any sanctions for failure to comply with such a "notice" and what is "directed" therein. What the Secretary *may* do is set out in section 1857d(g), quoted in the first part of this *opinion*, namely, ask the Attorney General to bring such an action as the present suit.

■■ The *hearing*, therefore, is not an adjudicative hearing. It is not subject to the provisions of the APA dealing with adjudicative hearings, 5 U.S.C.A. § 555. The conference and the hearing were merely the statutory prerequisites to the bringing of the lawsuit. Ewing v. Mytinger & Casselberry, 339 U.S. 594, 598, 70 S.Ct. 870, 94 L.Ed. 1088 (1949).

■■ Due process does require, however, that defendant have a due process hearing before any judgment is rendered by this Court. In that connection the provisions of section 1857d(h)[14] must be considered. That subsection provides that in such a case as this:

"The court shall receive in evidence in any suit brought in a United States court under subsection (g) of this section a transcript of the proceedings before the board and a copy of the board's recommendations and shall receive such further evidence as the court in its discretion deems proper. The court, giving due consideration to the practicability of complying with such standards as may be applicable and to the physical and economic feasibility

---

14. Formerly section 1857d(g).

of securing abatement of any pollution proved, shall have jurisdiction to enter such judgment, and orders enforcing such judgment, as the public interest and the equities of the case may require."

If the provision that the court "shall receive in evidence" a transcript of the proceedings before the board and a copy of the board's recommendations means that in this case this Court may consider the findings and recommendations of the Hearing Board as evidence of the facts contained in such findings and recommendations, a serious question of due process is presented. A similar question is presented if defendant is not afforded an opportunity (1) to cross-examine the witnesses who testified at the hearing if it was not given an opportunity to cross-examine them then; (2) to cross-examine persons whose affidavits were accepted at the hearing without its consent, and (3) to present evidence in addition to that which it presented to the Hearing Board.

 This Court concludes, however, that section 1857d(h) should be so construed that at the trial of this case the findings and recommendations of the Hearing Board should be received and considered by the Court as the recommendations of the Board with respect to what judgment "the public interest and the equities of the case may require". Those findings and recommendations should not be received as evidence to prove disputed facts. The testimony and other evidence presented to the Hearing Board and appearing in the transcript should be considered by the Court in making its findings of fact, subject to applicable rules of evidence, which should be liberally applied in favor of the admission of such evidence. Both the government and defendant should be given a reasonable opportunity to produce additional evidence. This procedure will avoid duplication of effort and conserve the time of the Court, and will preserve defendant's due process rights.

The flexible development of such procedures is necessary if the Courts are to cope with such problems as are presented on a Lilliputian scale in this case, and will be presented on a Brobdingnagian scale in future cases.

 (a) Defendant complains because no procedural rules for hearings called for by section 1857d(f) (1)[15] were adopted by the Secretary before the hearing in defendant's case.[16] Defendant's case was the first case which had ever proceeded to hearing under the Act, and this suit is the first suit ever filed by the government under the Act. A Notice of Proposed Rule Making for regulations governing such hearings (see Part 81 of Title 42, C.F.R.) was published in the Federal Register on April 3, 1967. Those proposed regulations were adopted on April 21, 1967, as the "Hearing Procedures for Selbyville, Delaware-Bishop, Maryland, Area Public Hearing". By letter dated April 26, 1967, the Secretary transmitted the Notice of Public Hearing and the Hearing Procedures to all the parties to the hearing to be held on May 17 and 18, 1967, including Bishop Processing Company. Since that was the first hearing to be held under the Act, and since the procedures established for that hearing were appropriate therefor, the Court finds no violation of due process by reason of the fact that similar procedures for future hearings had not been adopted. The equal protection argument made by defendant is not supported by the present record, since it does not appear that any other hearings have ever been held, or that any different hearing procedures have ever been adopted.

 (b) Defendant argues that the issuance of air quality criteria and control and emission standards are a prerequisite to an administrative hearing under section 1857d(f) (1)[17] and such an

---

15. Formerly section 1857d(e) (1).

16. The *conference* called for by section 1857d(d), formerly section 1857d(c), was clearly not a hearing which required any procedural rules.

17. Formerly section 1857d(e) (1).

action as this under section 1857d(g).[18] There is no merit in this contention. Courts of equity have always had the power to abate nuisances. Section 1857d gives the district courts jurisdiction to abate "pollution of the air in any State or States which endangers the health and welfare of any persons", subject to other provisions in the Act which limit the jurisdiction of the federal courts under section 1857d(g) (1) to cases which properly come within the commerce power.

Nowhere in the statute or its legislative history is there any support for the position that the institution of administrative proceedings under section 1857d (d) (1) (A), followed by a hearing under (f) (1) and a suit under (g) (1) (A), relating to air pollution subject to abatement under section 1857d(a), is dependent on the issuance of air quality criteria or recommended control techniques.[19]

The amendments to the Act adopted in 1967, which require the issuance of air quality criteria and recommended control techniques, are irrelevant to these proceedings. Those criteria and techniques are essential *only* to the establishment of *air quality control regions* designated pursuant to the 1967 amendments. The Court is advised that some "air quality control regions" have been designated within the past month. Under section 1857d(c) (4), the Secretary may now, when an air quality standard is violated, request that suit be instituted without invoking the conference-hearing procedure. Separate provisions are made in that subsection for judicial action in such a case.

The provisions which existed before November 1967, under which the administrative proceedings in this case were taken, were preserved in the 1967 amendments and were renumbered. The legislative history of the 1967 amendments, as well as the provisions of the Act as amended, show the congressional intent that the conference-hearing abatement approach was not to be eliminated by the new alternative, regional approach, which is dependent on air quality criteria and standards.[20]

■ (c) Defendant contends that the conference proceeding in this case does not meet the requirements of a rule-making process or the requirements of the Act. It is clear, however, that the conference called for by section 1857d(c), as it read in 1965 and as it now reads, renumbered as section 1857d(d), was not a rule-making hearing within the meaning of the APA and is not governed by 5 U.S.C.A. § 553. The conference procedure did not violate the requirements of the Act. See the second paragraph of Section III of this opinion, above.

■ (d), (f) Defendant's contentions that it was insufficiently informed of the factual and legal bases of the hearing and that the findings of the Hearing Board were inadequate are without merit. The Notice of Hearing and the Findings and Recommendations of the Hearing Board were clearly adequate.

■ (e) Defendant argues that it was denied due process because the Hearing Board contained representatives of the complaining agencies, the Delaware State Air Pollution Authority and the Maryland State Department of Health, who had been involved in the preliminary proceedings.

First, it should be noted that this hearing was not an adjudicatory hearing within the meaning of the APA, 5 U.S.C.A. § 554.[21] Moreover, it is a proceed-

18. Formerly section 1857d(f).

19. The findings and recommendations of the Hearing Board under section 1857d (f) (2) are directed to the question whether "pollution referred to in subsection (a) is occurring".

20. H.R.Rep.No. 728, p. 27; S.Rep. 403, pp. 30–31, 90th Cong. At p. 31 of the Sen.Rep., the Senate Committee on Pub-

lic Works declares: " * * * the committee has directed the Secretary to continue to act to abate pollution pursuant to existing abatement procedures whenever he finds the public health or welfare endangered."

21. 5 U.S.C.A. § 554 of the Act is applicable "(a) * * * in every case of adjudication required by statute to be de-

ing excluded from the APA by 5 U.S.C.A. § 556.[22] If the hearing were an adjudicatory hearing, the presence on the Hearing Board of the persons complained of would probably violate the rule applied in American Cyanamid Co. v. F.T.C., 363 F. 2d 757 (6 Cir. 1966), unless this court proceeding can properly be considered to be essentially a trial de novo. See discussion in note 21. Since, however, the hearing was not an adjudicatory hearing the question is not whether this action is a trial de novo, but whether the provisions of section 1857d(h) deprive defendant of a due process hearing in this Court. For the reasons set out above, in the first part of Section III of this opinion, the Court has concluded that the trial in this Court provided for by section 1857d(g) and (h) will afford defendant the due process hearing to which it is entitled before any sanctions may be imposed upon it.

### IV.

Defendant's final challenge to the complaint is that this Court cannot take jurisdiction under the Act because of a suit pending in the Circuit Court for Worcester County, Maryland, filed against defendant on February 2, 1967, by the State of Maryland on the relation of the Maryland State Board of Health and Mental Hygiene, the Maryland State Department of Health, and the Maryland Department of Water Resources, raising similar issues, inter alia. It is true that the philosophy of the Act is not to displace but to encourage state, local and interstate action to abate air pollution. But a pending suit in a state court does not oust the jurisdiction of a district court over such a suit as this. The action in this Court arises out of proceedings instituted under the federal Act a year and a half before the filing of the state court suit, which has not proceeded to judgment. Moreover, it appears that the state court suit is addressed primarily to defendant's water pollution. Comity does not require this Court to abstain from proceeding with the present action instituted by the United States.

Defendant's motion to dismiss must be and it is hereby denied.

---

termined on the record after opportunity for an agency hearing, except to the extent that there is involved—(1) a matter subject to subsequent trial of the law and facts de novo in a court." As this Court noted in Bishop Processing Co. v. Gardner, 275 F.Supp. at 783, the court proceeding called for by section 1857d(g) and (h) falls somewhere between what is ordinarily considered a trial de novo and a judicial review of an administrative order or other action where no additional evidence is taken and the test is whether there is substantial evidence in the rec-

ord considered as a whole to support the order or action. Since the hearing is not within 5 U.S.C.A. § 554, it is not necessary to decide whether the court proceeding is a hearing de novo within the meaning of that section.

22. " * * * This subchapter [the APA] does not supersede the conduct of specified classes of proceedings, in whole or in part, by or before boards or other employees specially provided for by or designated under statute. * * * " 5 U.S. C.A. § 556.